

UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

**FILED**

FEB 0 5 2008

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |  |
|---|---|---|
| CHARLES E. SISNEY, | * | CIV 03-4260 |
| | * | |
| Plaintiff, | * | |
| | * | |
| vs. | * | |
| | * | |
| TIM REISCH, Secretary of Corrections for | * | MEMORANDUM OPINION |
| South Dakota; DOUGLAS L. WEBER, | * | AND ORDER |
| Chief Warden for the Department of | * | |
| Corrections of South Dakota; DENNIS | * | |
| BLOCK, Associate Warden for the South | * | |
| Dakota State Penitentiary; JENNIFER | * | |
| WAGNER a/k/a Jennifer Lane, Cultural | * | |
| Activities Coordinator for the South Dakota | * | |
| State Penitentiary; DOUG LOEN, Policy | * | |
| Analyst for the South Dakota State | * | |
| Penitentiary; DARYL SLYKHUIS, Interim | * | |
| Warden of the South Dakota State | * | |
| Penitentiary; JOHN/JANE DOE STAFF | * | |
| MEMBERS, AGENTS, EMPLOYEES | * | |
| AND/OR OFFICERS OF THE SOUTH | * | |
| DAKOTA STATE PENITENTIARY | * | |
| AND/OR SOUTH DAKOTA | * | |
| DEPARTMENT OF CORRECTIONS; all | * | |
| Defendants sued in both their individual and | * | |
| official capacities, | * | |
| | * | |
| Defendants. | * | |
| | * | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court are Defendants' Motion to Strike, Doc. 272, and Defendants'

Motion for Summary Judgment, Doc. 214, on the grounds of qualified immunity and the merits. In

a separate brief, Defendants also seek summary judgment on any claims asserted under the Religious

Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. §§ 2000cc-2000cc-5,

on the grounds that RLUIPA is unconstitutional. The Court allowed the United States to intervene

for presentation of evidence and for argument on the question of the constitutionality of RLUIPA. The United States filed a brief in opposition to the Defendants' constitutional challenge to RLUIPA. After repeated continuances, Plaintiff Charles Sisney, who was represented by counsel, filed a brief regarding the constitutionality of RLUIPA and a separate brief addressing qualified immunity and the merits. Defendants filed reply briefs. For the reasons set forth below, the Court will grant in part and deny in part Defendants' summary judgment based on qualified immunity and the merits and will deny Defendants' summary judgment motion challenging the constitutionality of RLUIPA. The Motion to Strike will be denied.

## I. BACKGROUND

The facts will be stated in the light most favorable to Sisney, as the non-moving party in these summary judgment proceedings. Sisney is serving a life sentence at the South Dakota State Penitentiary ("SDSP"). He has been incarcerated at the SDSP since April 11, 1997. He was convicted of first-degree murder, but he has no history of violence or assaultive behavior while incarcerated in the SDSP. His security classification is high/medium risk. He now practices the Jewish faith and he brought this action alleging various violations of his religious freedom rights, right to equal protection of the laws, retaliation and denial of access to the courts. He began learning and studying about Judaism before he was incarcerated, but does not claim he was practicing the Jewish faith before his incarceration.

Defendant Tim Reisch is the Secretary of the South Dakota Department of Corrections ("DOC"). Reisch is the final policy maker regarding DOC policies, rules and regulations. Defendant Douglas Weber is the Warden of the SDSP. Weber is the final policy maker regarding Operational Memoranda, which are the policies and operational guidelines in place at the SDSP. Defendant Daryl Slykhuis served as the Interim Warden of the SDSP at the time of the event alleged in Sisney's Amended Supplemental Complaint (Doc. 63). Defendant Dennis Block is an Associate Warden at the SDSP, and he is the official who approves or disapproves inmates' requests regarding religious and cultural activities. Defendant Jennifer Wagner, a/k/a Jennifer Lane, is the Cultural Activities Coordinator for the SDSP. She is the SDSP official that first reviews inmates' requests

regarding religious and cultural activities, which are submitted on a form entitled "Project Application". If Wagner believes the Project Application involves security issues, she brings the application to the attention of Block for his review. These Project Applications may also be discussed at weekly meetings, which Block, Weber and other senior SDSP officials attend. Defendant Doug Loen is Legal Counsel for the DOC. His office is located at the SDSP. He is responsible for drafting policies and procedures under the direction, supervision and control of the Secretary of Corrections and the Wardens. Loen is not the final policymaker on either DOC policies or Operational Memoranda and he does not possess supervisory authority over SDSP correctional officers.

Sisney asserts various claims against each of the Defendants. Several claims have been dismissed from this action and the Court ruled on Defendants' Motion for Summary Judgment on the grounds of failure to exhaust administrative remedies. Two claims were dismissed for failure to exhaust administrative remedies, which were Sisney's claims that Defendants lied in internal state investigations and that Defendants conspired to conceal unlawful discrimination against Sisney. (Doc. 212.) The claims remaining in this action are set forth in Sisney's Amended Complaint (Doc. 60), excluding paragraphs 111-121, 126, 129 and 130, and in paragraphs 6, 13 -20, and 54-55 of the Amended Supplemental Complaint II (Doc. 63). Sisney contends the Defendants have violated the First Amendment and RLUIPA by: (1) their refusal to allow Sisney to erect and use a succah or Sukkot Booth during the Festival of Sukkot; (2) their refusal to establish a permanent Jewish chapel; (3) their denial of additional service time for group Torah, Kabalistic and language studies; (4) their refusal to use the Benevolence Fund to assist the Jewish group in obtaining a Rabbi to visit the inmates; (5) their interference with a visit by rabbinical students; (6) their refusal to allow Sisney to possess certain personal property for the exercise of his religion; and (7) refusal of Sisney's request to review what he refers to as the "Jewish curriculum" maintained by the Cultural Activities Coordinator. The property claims involve the following items: succah, charity box, tape player, religious calendar, herbs and oils, lightbulb diffuser, incense in chapel, and tzit-tzit string. Retaliation claims are asserted by Sisney against Wagner and Slykhuis. Equal Protection claims are asserted by Sisney for the refusal to allow Sisney to erect a succah, for denial of kosher coffee, and

the denial of tzit-tzit string to repair Sisney's tzit-tzit shirt. Sisney also claims Defendants Slykhuis and Loen denied him access to the courts.

Defendants Reisch and Weber seek summary judgment on the grounds that the record does not show sufficient personal involvement regarding Sisney's claims, and, in the alternative, their actions were constitutional. All Defendants seek summary judgment on the merits of Sisney's claims, or, in the alternative, they seek the protection of qualified immunity. As to Sisney's state-law claims, Defendants contend the Court should decline to consider them, but if the Court does consider these claims Defendants urge the Court to deny relief on all of the claims.

Sisney counters that Reisch and Weber were personally aware of the claimed violations of his rights and did nothing to correct the other Defendants' unconstitutional actions. He wrote two letters to Reisch explaining his complaints and he filed several grievances with Weber addressing the claims in this action. Sisney further contends Defendants are not entitled to summary judgment on the merits of his claims and that they are not entitled to qualified immunity. Sisney points out that his state-law claims were dismissed by the Court. The Court agrees there are no longer any state-law claims in this action because all such claims, stated in Sisney's Amended Complaint, Doc. 60, were dismissed for failure to exhaust administrative remedies. *See* Memorandum Opinion and Order, Doc. 212.

## II. DISCUSSION

In considering a motion for summary judgment, the Court asks the question whether the record, when viewed in the light most favorable to the non-moving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. FED.R.CIV.P. 56(c). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" *Commercial Union Ins. Co. v. Schmidt*, 967 F.2d 270, 271 (8th Cir. 1992) (quoting FED.R.CIV.P. 56(e)). Simply creating a factual dispute cannot defeat a motion for summary judgment; rather, there must be a

genuine dispute over those facts that could actually affect the outcome of the lawsuit. *See, e.g., Ghane v. West*, 148 F.3d 979, 981 (8th Cir. 1998). "A plaintiff's verified ... Complaint is the equivalent of an affidavit for purposes of summary judgment, and a complaint signed and dated as true under penalty of perjury satisfies the requirements of a verified complaint." *Roberson v. Hayti Police Dep't*, 241 F.3d 992, 994-95 (8th Cir. 2001) (citations omitted). If the allegations in the verified complaint consist of nothing more than conclusory allegations, however, they are insufficient to overcome a summary judgment motion. *See Roberson v. Bradshaw*, 198 F.3d 645, 647 (8th Cir. 1999).

Sisney brings claims under both 42 U.S.C. § 1983 and RLUIPA. RLUIPA was enacted in 2000 after the Supreme Court declared the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb *et seq.*, unconstitutional as applied to states and localities in *City of Boerne v. Flores*, 521 U.S. 507 (1997). *See Cutter v. Wilkinson*, 544 U.S. 709, 714-15 (2005) (setting forth the history of the enactment of RFRA and RLUIPA). RLUIPA is similar to, but not identical to, RFRA. *See id.* at 715-16.

## A.   Supervisory Liability

Defendants Reisch and Weber contend they were not directly or personally involved in the actions or events Sisney challenges as unlawful. The Court agrees with Defendants Reisch and Weber's argument that they cannot be held liable on the theory of respondeat superior. *See Choate v. Lockhart*, 7 F.3d 1370, 1376 (8th Cir. 1993). "In the section 1983 context, supervisor liability is limited." *Boyd v. Knox*, 47 F.3d 966, 968 (8th Cir. 1995). "'For a supervisor to be held liable for the acts of a subordinate, something more must be shown than merely the existence of the supervisor-subordinate, relationship.'" *Ripson v. Alles*, 21 F.3d 805, 809 (8th Cir. 1994) (quoting *Clay v. Conlee*, 815 F.2d 1164, 1170 (8th Cir. 1987)). "'The supervisor must know about the conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what he might see.'" *Id.*

Sisney does not, however, seek to hold Reisch and Weber liable solely on a theory of respondeat superior. Rather, Sisney alleges these two Defendants were personally aware of the alleged unlawful conduct by the other Defendants and they did not take appropriate action to end such conduct by their subordinates. As to Reisch, Sisney is not allowed to file grievances with Reisch, but Sisney did write two letters to Reisch explaining his allegations of discrimination and restrictions on the exercise of his religion. Although Reisch is expected to know the law, Sisney included a copy of RLUIPA with the letters sent to Reisch. After receiving Sisney's letters, Reisch contacted the SDSP regarding Sisney's concerns. Reisch states he was satisfied after that contact that SDSP staff were working to accommodate Sisney's requests and yet maintain institutional security, safety and order. Reisch took no further action to ensure that Sisney's right to exercise his religion was not being substantially burdened.

Weber was made aware of all of Sisney's claims in this action through the prison grievance system. Weber denied all of the Requests for Administrative Remedy and was the final administrative appeal Sisney could pursue for his requests at issue in this lawsuit. Unlike the prisoner plaintiff in *Boyd*, Sisney has produced evidence to show that both Reisch and Weber knew about Sisney's allegations of discrimination and constitutional deprivations, and has produced evidence to show that despite this knowledge they condoned the denial of Sisney's requests at issue in this action, which he contends imposed a substantial burden on the exercise of his religion. *See Boyd*, 47 F.3d at 969 (granting summary judgment in favor of prison supervisors because the inmate plaintiff failed to "offer any proof that the two supervisors knew about his condition, let alone that they were deliberately indifferent to his serious medical needs."). In light of Weber and Reisch's alleged personal involvement and knowledge regarding Sisney's requests for religious accommodation, they are not entitled to summary judgment on the grounds that Sisney is seeking to hold them liable solely in their supervisory capacities.

**B.    Individual and official capacity claims under § 1983**

"To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was

committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988) (citations omitted).   Sisney has alleged several violations of the Free Exercise Clause of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment and has asserted claims for retaliation and denial of access to the courts.  He has also raised an independent statutory claim under RLUIPA, which is subject to a different standard than his constitutional claims regarding the exercise of his religion.  As to the constitutional claims under § 1983, it is clear that all Defendants acted under color of state law.  *See id.* at 49-50 (stating "generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.").

All Defendants are sued in both their individual and official capacities.  All claims for monetary damages against the Defendants in their official capacities are claims against the State of South Dakota. *See Johnson v. Outboard Marine Corp.*, 172 F.3d 531, 535 (8th Cir. 1999).  Damages claims against the State are barred by the Eleventh Amendment, unless South Dakota consented to suit or Congress abrogated its immunity. *See Kentucky v. Graham*, 473 U.S. 159, 169 (1985) (absent waiver by the State of South Dakota or valid override by Congress, "the Eleventh Amendment bars a damages action against a State in federal court"); South Dakota Constitution, Article III, Section 27; SDCL § 3-22-17, (the State of South Dakota has not waived its Eleventh Amendment immunity for damages actions in federal court).  South Dakota has not consented to suit under 42 U.S.C. § 1983 and Congress has not abrogated South Dakota's Eleventh Amendment immunity under § 1983. Accordingly, all claims for monetary damages against the Defendants in their official capacity under 42 U.S.C. § 1983 are barred.  Claims for monetary damages under RLUIPA are discussed below.

The only situation in which state officials acting in their official capacities will be considered "persons" for purposes of § 1983, and the Eleventh Amendment will not bar the § 1983 claim, is where the plaintiff is seeking prospective relief. *See Murphy v. Arkansas*, 127 F.3d 750, 754 (8th Cir. 1997).  Sisney seeks prospective relief in this action.  Accordingly, the § 1983 official-capacity claims on which Sisney seeks prospective relief are not barred by the Eleventh Amendment.

7

Although the official-capacity § 1983 claims seeking monetary damages against the Defendants are barred by the Eleventh Amendment, "damages awards against individual defendants in federal courts 'are a permissible remedy in some circumstances notwithstanding the fact that they hold public office.' That is, the Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983." *Hafer v. Melo*, 502 U.S. 21, 30-31 (1991) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 238 (1974)). State officials sued in their individual capacities may assert personal immunity defenses such as qualified immunity. *See Hafer*, 502 U.S. at 25. All Defendants are sued in their individual capacity for monetary damages, including compensatory, nominal and punitive damages. Therefore, the Court will consider the individual-capacity § 1983 claims against the Defendants, including their qualified immunity defenses.

**C.    Individual and official capacity claims under RLUIPA**

Sisney seeks to hold Defendants liable in both their individual and official capacities under RLUIPA. If the Court upholds the constitutionality of RLUIPA, Defendants contend it may only be constitutionally applied to provide a narrow class of remedies, for a narrow class of claims, against a narrow class of defendants. Defendants contend that only official capacity claims for prospective or injunctive relief against the State or final policymakers may be maintained under RLUIPA, because prospective relief is not available against them in their individual capacities. Defendants' position is that the Eleventh Amendment bars claims for money damages against the States or against State officials sued in their official capacities, thus limiting relief under RLUIPA to prospective relief against Defendants in their official capacities. Moreover, Defendants contend Defendant Weber, as the final policy maker regarding the policies at issue in this lawsuit, is the only proper defendant to the RLUIPA claims in this action. Finally, Defendants contend the Court lacks jurisdiction over Sisney's RLUIPA claim because he has not established that the government's programs or activities receive federal financial assistance or that the government's actions are in some way affecting interstate commerce. *See* 42 U.S.C. § 2000cc-1(b).

Sisney asserts he can recover both monetary damages and injunctive relief for RLUIPA violations against Defendants in both their official and individual capacities. He contends monetary

8

damages are allowed on the official capacity RLUIPA claims because the State of South Dakota's Eleventh Amendment immunity is waived pursuant to the Civil Rights Remedies Equalization Act of 1986 (the "Equalization Act"), 42 U.S.C. § 2000d-7, and the text of RLUIPA permits the recovery of monetary damages.

RLUIPA's remedial provision states in relevant part, "A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government." 42 U.S.C. § 2000cc-2(a). The term "government" under RLUIPA is defined as: "(I) a State, county, municipality, or other governmental entity created under the authority of a State; (ii) any branch, department, agency, instrumentality, or official of an entity listed in clause (I); and (iii) any other person acting under color of State law[.]" 42 U.S.C. § 2000cc-5(4). There is a division of authority among the federal courts of appeals and district courts regarding whether RLUIPA authorizes an award of monetary damages, in addition to equitable relief; whether individual capacity suits for monetary damages are allowed under RLUIPA; and whether official capacity suits under RLUIPA for monetary damages are barred by the Eleventh Amendment.

The Eighth Circuit has not decided any of these issues. In *Murphy v. Missouri Dep't of Corr.*, 372 F.3d 979 (8th Cir. 2004), the Eighth Circuit reversed the District Court's grant of summary judgment to prison officials on the plaintiff prisoner's RLUIPA claims. The prisoner in *Murphy* sought monetary relief, *see* 372 F.3d at 982, but the panel did not address the availability of such relief in reversing the District Court. The issue of individual versus official capacity claims was not address in *Murphy*, and Eleventh Amendment immunity was not discussed. Some courts, including two district courts in the Eighth Circuit, have allowed prisoner claims for monetary damages under RLUIPA to proceed, but did not explicitly decide the question or discuss the split of authority on whether RLUIPA authorizes such relief. *See Shabazz v. Norris*, 2007 WL 2819517 (E.D.Ark. Sept. 26, 2007) (allowing action for recovery of monetary damages under RLUIPA to proceed, but limiting relief to nominal damages under 42 U.S.C. § 1997e(e)); *El-Tabech v. Clarke*, 2007 WL 1487148, at *3 (D.Neb. May 18, 2007) (noting prisoner plaintiffs sought monetary relief for alleged RLUIPA violations, but not explicitly deciding whether monetary relief is available under

9

RLUIPA); *Smith v. Allen*, 502 F.3d 1255, 1270 (11th Cir. 2007) (collecting cases where district courts have "assumed that money damages are available, without actually deciding the question."). Another district court within the Eighth Circuit found the individual prison officials were subject to suit under RLUIPA because they were "official[s] of an entity" under 42 U.S.C. § 2000cc-5(4)(A)(ii), but it is not clear whether the court found prison officials were subject to a monetary damages claim in both their individual and official capacities. *See Robinson v. Kempker*, 2007 WL 1385700, at *5-6 (E.D. Mo. May 8, 2007). There is a wide division of authority on all of these issues among the circuit and district courts. For the reasons set forth below, the Court concludes that individual capacity claims are not allowed under RLUIPA, that South Dakota's Eleventh Amendment immunity does not bar claims for monetary damages under RLUIPA on official capacity claims, pursuant to the Equalization Act, and the remedies provision in RLUIPA allowing a recovery of "appropriate relief against a government" includes the potential of recovering monetary damages against the State of South Dakota on the official capacity claims.

### 1. Individual capacity claim for monetary damages under RLUIPA

Several courts have held that individual capacity claims are not permitted under RLUIPA. *See Smith*, 502 F.3d at 1271-75 (discussing at length the issue of individual capacity claims under RLUIPA and concluding that "section 3 of RLUIPA - a provision that derives from Congress' Spending Power - cannot be construed as creating a private action against individual defendants for monetary damages."); *Daker v. Ferrero*, 475 F.Supp.2d 1325, 1335-47 (N.D.Ga. 2007), *vacated in part on other grounds*, 506 F.Supp.2d 1295 (N.D.Ga. 2007) (same); *Boles v. Neet*, 402 F.Supp.2d 1237, 1240 (D.Colo. 2005) (interpreting 42 U.S.C. § 2000cc-2(a) "to permit cases against a governmental entity, but not against an individual officer, except perhaps in his or her official capacity.") (citing *Hale O Kaula Church v. Maui Planning Comm'n*, 229 F.Supp.2d 1056, 1067 (D.Haw. 2002) ("RLUIPA provides a cause of action against 'government' and does not appear to allow causes of action against individuals."); *Guru Nanak Sikh Society of Yuba City v. County of Sutter*, 326 F.Supp.2d 1128, 1136 (E.D. Cal. 2003) (finding that the term "government" includes an official of the entity, and therefore permits suit against the official at least in his or her official

capacity); *Rowe v. Davis*, 373 F.Supp.2d 822, 828 (N.D.Ind. 2005) (RLUIPA claim may proceed against correctional officer or his successor on an official capacity basis)).

Other courts have held individual capacity claims are allowed under RLUIPA. These courts have held that the definition of "a government" under RLUIPA includes individual government officials and "any other person acting under color of State law." 42 U.S.C. § 2000cc-5(4)(A)(ii-iii); *see Agrawal v. Briley*, 2006 WL 3523750, at *9-13 (N.D.Ill. Dec. 6, 2006); *Marsh v. Granholm*, 2006 WL 2439760, at *10-11 (W.D.Mich. Aug. 22, 2006). The district court in *Agrawal*, concluded that "[i]f RLUIPA authorized only official-capacity claims, subsection (iii) would have no purpose because subsection (ii) already authorizes claims against government 'officials.' *See* 42 U.S.C. § 2000cc-5(4)(A)(ii)." *Agrawal*, 2006 WL 3523750, at *11. Other district courts have allowed individual capacity suits for money damages under RLUIPA following the same rationale. *See Marsh*, 2006 WL 2439760, at *10-11 (following the decision in *Daker v. Ferrero*, 2006 WL 346440 (N.D.Ga. Feb. 13, 2006), in holding that while § 2000cc-2(a) "does not explicitly permit individual capacity suits for money damages, it does not explicitly preclude them either."); *Orafan v. Goord*, 2003 WL 21972735, at *9 (N.D.N.Y. Aug. 11, 2003) (interpreting the "plain language" of § 2000cc-5(4)(A) to contemplate individual liability).

The Eleventh Circuit, however, found a flaw with the district court decisions finding the inclusion of "any other person acting under color of State law," in § 2000cc-5(4)(A)(iii) authorizes individual capacity suits for money damages. *See Smith*, 502 F.3d at 1272-75. The flaw is that RLUIPA was enacted pursuant to Congress' Spending Power under Article I of the Constitution and "Congress cannot use its Spending Power to subject a non-recipient of federal funds, including a state official acting [in] his or her individual capacity, to private liability for monetary damages." *Id.* at 1272-73. Prior to the Eleventh Circuit's decision in *Smith, supra*, the district court in the Northern District of Georgia examined this rationale in detail in *Daker*, 475 F.Supp.2d at 1335-42, and likewise concluded Section 3 of RLUIPA does not authorize money damages against prison officials in their individual capacities.

11

Although the Eighth Circuit has not addressed individual capacity liability under RLUIPA, it held that because Title IX was enacted under the Spending Clause, "Title IX will not support an action against [a school official] in her individual capacity." *Kinman v. Omaha Pub. Sch. Dist.*, 171 F.3d 607, 610-11 (8th Cir. 1999). This is the same rationale adopted by the Eleventh Circuit in *Smith, supra,* and the Northern District of Georgia in *Daker*, 475 F.Supp.2d at 1335-42, for rejecting individual capacity liability under RLUIPA. Given the Eighth Circuit's holding in *Kinman*, the Court agrees with the Eleventh Circuit's decision in *Smith*, that, "section 3 of RLUIPA - a provision that derives from Congress' Spending Power - cannot be construed as creating a private action against individual defendants for monetary damages." 502 F.3d at 1275.[1]

### 2. Official capacity claim for monetary damages and Eleventh Amendment immunity under RLUIPA

In this section, the Court will address the questions of whether the State of South Dakota is entitled to Eleventh Amendment immunity from monetary damages and, if not, whether monetary damages are recoverable under RLUIPA. The Supreme Court declared that federal courts are to "'find waiver [of sovereign immunity] only where stated by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *College Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 678 (1999) (quoting *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (internal quotation marks omitted)). Stated in another way, "'an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language.'" *Id.* (quoting *Welch v. Texas Dep't Of Highways and Pub. Transp.* 483 U.S. 468, 478 & n. 8 (1987)).

---

[1]Likewise, the Court agrees with the Eleventh Circuit that despite the reference to Congress' Commerce Clause Power in 42 U.S.C. § 2000cc-1(b), RLUIPA "hinges on Congress' Spending Power rather than its Commerce Clause Power." *Smith*, 502 F.3d at 1274 & n. 9; *see Daker*, 475 F.Supp.2d at 1342-47 (concluding that construing Section 3 of RLUIPA to authorize money damages actions against prison officials in their individual capacity based upon Congress' use of its power under the Commerce Clause would raise "serious constitutional concerns.").

Similar to individual capacity claims, there is a division of authority among federal courts regarding whether the Eleventh Amendment bars recovery of monetary damages for official capacity claims under RLUIPA. Two federal courts of appeal have ruled on this issue, as well as several district courts. The Eleventh Circuit held the Eleventh Amendment does not bar a recovery of monetary damages against a prison official in his or her official capacity. *See Smith*, 502 F.3d at 1276 & n. 12. In *Smith*, the Eleventh Circuit stated that in *Benning v. Georgia*, 391 F.3d 1299, 1305 (11th Cir. 2004), it "held that section 3 of RLUIPA effectuated a clear waiver of the state's sovereign immunity under the Eleventh Amendment[.]" In *Benning*, without any significant analysis, the Eleventh Circuit stated: "Congress unambiguously required states to waive their sovereign immunity from suits filed by prisoners to enforce RLUIPA." 391 F.3d at 1305. The Eleventh Circuit concluded in *Smith*, that in light of this holding in *Benning*, "the Eleventh Amendment will not shield the state (and its agents) from an official capacity action for damages under RLUIPA." 502 F.3d at 1276 & n. 12.

At least one district court has agreed with the Eleventh Circuit that the Eleventh Amendment does not bar monetary damages under RLUIPA against states and state officials in their official capacities. *See Price v. Caruso*, 451 F.Supp.2d 889, 902 (E.D. Mich. 2006) (finding that Congress required States to waive their sovereign immunity under RLUIPA, including suits for money damages, in exchange for accepting federal prison funding).

Contrary to the Eleventh Circuit, the Fourth Circuit held the Eleventh Amendment immunity for official capacity claims for monetary damages is not waived in RLUIPA. *See Madison v. Virginia*, 474 F.3d 118, 130-33 (4th Cir. 2006). In *Madison*, the Fourth Circuit cited the Eleventh Circuit's decision in *Benning*, and recognized that, "[b]y voluntarily accepting federal correctional funds, [the State of Virginia] consented to federal jurisdiction for at least some form of relief." *Madison*, 474 F.3d at 130 (citing *Benning*, 391 F.3d at 1306). The Fourth Circuit held, "[t]hat RLUIPA unambiguously conditions federal prison funds on a State's consent to suit, however, does not end our inquiry. Congress is, of course, free to condition funds upon a waiver of 'sovereign immunity against liability without waiving [a State's] immunity from monetary damages awards.'"

13

*Madison*, 474 F.3d at 131 (quoting *Lane v. Pena*, 518 U.S. 187, 196 (1996); *see Lovelace v. Lee*, 472 F.3d 174, 193-94 (4th Cir. 2006) (following *Madison, supra*, and rejecting claim for monetary damages against prison official in his official capacity). The Fourth Circuit concluded that "RLUIPA's 'appropriate relief against a government' language falls short of the unequivocal textual expression necessary to waive State immunity from suits for damages." *Madison*, 474 F.3d at 131.

Several district courts have held that the Eleventh Amendment bars claims for monetary damages against states and state officials in their official capacity, including two district courts in the Eighth Circuit. *See Toler v. Leopold*, 2007 WL 2907889, at *1 (E.D.Mo. Oct. 1, 2007) (granting summary judgment on prisoner's RLUIPA claims for monetary damages against the Missouri Department of Corrections and following *Madison*, 474 F.3d at 131, in finding the "appropriate relief against a government" provision in RLUIPA "falls short of the unequivocal textual expression necessary to waive State immunity from suits for damages."); *Toler v. Leopold*, 2007 WL 2238661, at *5 (E.D.Mo. Jul. 31, 2007) (same and granting summary judgment to individual prison officials on prisoner's RLUIPA claims for monetary damages against them in their official capacities); *Dean v. Blum*, 2007 WL 2264615, at *7 (D.Neb. Aug. 6, 2007) (holding that the Eleventh Amendment bars official capacity claims for monetary damages under RLUIPA, but not discussing whether Nebraska consented to suit under RLUIPA); *Nelson v. Miller*, 2007 WL 294276, at *9 (S.D.Ill. Jan. 30, 2007) (finding that: (a) Congress cannot abrogate a state's Eleventh Amendment immunity under RLUIPA, because it was enacted pursuant to Congress' Article I power; and (b) that Congress did not unambiguously express its intent in RLUIPA that a state must waive its sovereign immunity as to suits for money damages if the state accepts federal prison funds); *Agrawal*, 2006 WL 3523750, at *5-9 (disagreeing with the Eleventh Circuit's decision in *Benning, supra*, and finding that RLUIPA does not "demonstrate a clear intent to require a state to waive its immunity in exchange for its receipt of federal funds."); *Bilal v. Lehman*, 2006 WL 3626808, at *5 (W.D.Wash. Oct. 2, 2006) (recognizing that "a state's immunity to suits by private citizens is ... subject to the exception that a state may consent to suit," but finding Washington "has not expressly waived its immunity in regard to [the prisoner's] § 1983 and RLUIPA claims.").

14

The Court does not agree with the Eleventh Circuit and the district court for the Eastern District of Michigan that by entering into a funding contract with the Federal government by accepting federal prison funds ipso facto waives the State's Eleventh Amendment immunity for monetary damages under RLUIPA. Rather, Congress must use "unmistakably clear language" to effect such a waiver. *Welch v. Texas Dep't of Highways and Pub. Transp.*, 483 U.S. 468, 478 & n.8 (1987). The Court agrees with the Fourth Circuit's observation that, "general participation in a federal program or the receipt of federal funds is insufficient to waive sovereign immunity." *Madison*, 474 F.3d at 130 (citing *Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 246-47 (1985)).

In addition to the above case law on RLUIPA, analogous case law considering the federal government's sovereign immunity under RFRA is instructive. Although RLUIPA and RFRA are not identical, the remedial provision allowing "appropriate relief against a government" is the same in both statutes. *See* 42 U.S.C. § 2000cc-2(a) (RLUIPA provides: "A person may assert a violation of this chapter as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."); and 42 U.S.C. 2000bb-1(c) (RFRA provides: "A person whose religious exercise has been burdened in violation of this section may assert that violation as a claim or defense in a judicial proceeding and obtain appropriate relief against a government."). Examining this remedial language, the District of Columbia Circuit held the United States' sovereign immunity for monetary damages was not waived in RFRA:

> On its face, RFRA's reference to "appropriate relief" is not the "sort of unequivocal waiver that our precedents demand," *Lane*, 518 U.S. at 198, because that broad term is susceptible to more than one interpretation. In some contexts, "appropriate relief" might include damages. *Cf. West v. Gibson*, 527 U.S. 212, 222-23, 119 S.Ct. 1906, 144 L.Ed.2d 196 (1999) (holding that Title VII's reference to "appropriate remedies" contemplates compensatory damages where a statutory cross-reference explicitly authorizes them). However, another plausible reading is that "appropriate relief" covers equitable relief but not damages, given Congress's awareness of the importance of sovereign immunity and its silence in the statute on the subject of damages. We cannot find an unambiguous waiver in language this open-ended and equivocal.

*Webman v. Federal Bureau of Prisons*, 441 F.3d 1022, 1026 (D.C.Cir. 2006).

Although *Webman* involved the United States' sovereign immunity, Congress must use the same type of unequivocal language if it intends to impose waiver of a State's sovereign immunity as a condition for accepting federal funds. The Supreme Court equated federal sovereign immunity to State's sovereign immunity in discussing the unequivocal language Congress must use if it intends that States must waive their immunity if they take certain actions:

> [I]n the context of *federal* sovereign immunity - obviously the closest analogy to [*state* sovereign immunity] - it is well established that waivers are not implied. *See, e.g., United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969) (describing the "settled propositio[n]" that the United States' waiver of sovereign immunity "cannot be implied but must be unequivocally expressed"). We see no reason why the rule should be different with respect to state sovereign immunity.

*College Sav. Bank*, 527 U.S. at 682.

The Court finds Congress did not unambiguously require a State to waive its Eleventh Amendment immunity for monetary damages under RLUIPA by accepting federal prison funds. Like the *Webman* court found as to RFRA, "appropriate relief" might include the recovery of monetary damages, but an equally plausible interpretation is that it refers solely to equitable relief. 441 F.3d at 1026. Accordingly, the Court agrees with the Fourth Circuit in *Madison*, 474 F.3d at 131, and the Northern District of Illinois in *Agrawal*, 2006 WL 3523750, at *9, to the extent that they found a State's Eleventh Amendment immunity to an official capacity claim for monetary damages is not waived by unmistakably clear language in the text of RLUIPA.

That a State's Eleventh Amendment immunity is not waived by the text of RLUIPA, however, does not end the inquiry. Sisney contends the Civil Rights Remedies Equalization Act of 1986 ("the Equalization Act"), 42 U.S.C. § 2000d-7, contains the required unequivocal waiver of state sovereign immunity. That statute provides in relevant part:

> A State shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in Federal court for a violation of section 504 of the Rehabilitation Act of 1973, title IX of the Education Amendments of 1972, the Age Discrimination Act of 1975, title VI of the Civil Rights Act of 1964, or the provisions of any other Federal statute prohibiting discrimination by recipients of Federal financial assistance.

42 U.S.C. § 2000d-7(a)(1).   The Fourth Circuit examined the potential applicability of the
Equalization Act to RLUIPA.   Finding that RLUIPA is not like the statutes expressly listed in the
Equalization Act, the Fourth Circuit held, "it is not clear that RLUIPA is a 'Federal statute
prohibiting discrimination' and ambiguity again defeats plaintiff's claim that Virginia, by accepting
federal funds, knowingly consented for damages actions to be brought against it." *Madison*, 474
F.3d at 133.   The Court does not find the rationale in *Madison, supra*, persuasive on this issue.
RLUIPA was enacted, in part, to prohibit discrimination by prison officials against prisoners who
desire to exercise their religious beliefs.   The Seventh Circuit observed that: "RLUIPA follows in
the footsteps of a long-standing tradition of federal legislation that seeks to eradicate discrimination
and is 'designed to guard against unfair bias and infringement on fundamental freedoms.'" *Charles
v. Verhagen*, 348 F.3d 601, 607 (7th Cir. 2003) (quoting *Mayweathers v. Newland*, 314 F.3d 1062,
1066-67 (9th Cir. 2002)).   The right to exercise one's religion is clearly a fundamental freedom and
Congress found that prison officials were discriminating against prisoners who sought to exercise
their religious beliefs.   Accordingly, the Court finds that RLUIPA is a "Federal statute prohibiting
discrimination by recipients of Federal financial assistance", and the Court agrees with Sisney that
South Dakota's sovereign immunity for monetary damages on official capacity claims under
RLUIPA is waived under the Equalization Act by its acceptance of federal prison funding.   42
U.S.C. § 2000d-7(a)(1).

Having concluded the State is not immune from monetary damages by operation of the
Eleventh Amendment, the next question becomes whether RLUIPA itself allows for the recovery
of monetary damages.   The remedies' provision in RLUIPA allows an inmate to "obtain appropriate
relief against a government."   42 U.S.C. § 2000cc-2(a).   For Congress to authorize the recovery of
monetary damages in a statute, it is not required to use the same unequivocal language necessary for
a finding of waiver of Eleventh Amendment immunity.   The Eleventh Circuit examined in depth the
issue of whether RLUIPA authorizes an award of monetary damages, and concluded that the use of
the phrase "appropriate relief" in RLUIPA, 42 U.S.C. § 2000cc(a), "is broad enough to encompass
the right to monetary damages in the event a plaintiff establishes a violation of the statute.   Congress

17

expressed no intent to the contrary within RLUIPA, even though it could have, by, for example, explicitly limiting the remedies set forth in § 2000cc(a) to injunctive relief only." *Smith*, 502 F.3d at 1269-71. The *Smith* court assumed that in using the broad, general language of "appropriate relief" in RLUIPA, Congress was aware of the "presumption in favor of making all appropriate remedies available to the prevailing party," established by the Supreme Court in *Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 73 (1992), and its progeny. *Smith*, 502 F.3d at 1270-71. Accordingly, the Eleventh Circuit stated "[i]n light of that presumption, we conclude that, absent an intent to the contrary, the phrase 'appropriate relief' in RLUIPA encompasses monetary as well as injunctive relief." *Id.* at 1271.

The Fourth and District of Columbia Circuits also recognized that the phrase "appropriate relief" could be interpreted to include an award of monetary damages. *See Madison*, 474 F.3d at 131-32 (finding that the phrase "appropriate relief" could be interpreted in different ways and that it "might be read to include damages[.]"); *Webman*, 441 F.3d at 1026 (finding that the phrase "appropriate relief" is "susceptible to more than one interpretation" and that in some contexts it could include monetary damages). Despite the Court's disagreement with the Eleventh Circuit on the question of sovereign immunity, the Court does agree with the Eleventh Circuit's decision that

the phrase "appropriate relief" in RLUIPA encompasses the recovery of monetary damages.[2]  *See Smith*, 502 F.3d at 1269-71.

Even if RLUIPA did not contain the remedies provision allowing an inmate to "obtain appropriate relief against a government", the Supreme Court's decision in *Barnes v. Gorman*, 536 U.S. 181, 187 (2002), provides authority for the Court's holding that RLUIPA authorizes the recovery of compensatory damages. RLUIPA was enacted under Congress' Spending power and in discussing Spending Clause legislation, the Supreme Court held that: "A funding recipient is generally on notice that it is subject to those remedies traditionally available in suits for breach of contract.  Thus we have held that under Title IX, which contains no express remedies, a recipient of federal funds is nevertheless subject to suit for compensatory damages and injunction, forms of relief traditionally available in suits for breach of contract." *Barnes*, 536 U.S. at 187.  Congress did not preclude an award of monetary damages under RLUIPA, which is Spending Clause legislation, and pursuant to *Barnes*, the State of South Dakota would have been on notice that it is subject to that remedy because an award of compensatory damages is a form of relief traditionally available in suits for breach of contract.

---

[2]The Court notes the decision in *Smith* demonstrates the difference in the analysis of the question whether a statute allows for recovery of monetary damages compared to the question whether a statute waives a State's Eleventh Amendment immunity for monetary damages. The Court finds that although the phrase "appropriate relief" in RLUIPA allows for an award of monetary damages due to the presumption in *Franklin, supra*, that same presumption in *Franklin, supra*, may not override a government's sovereign immunity from monetary damages.  The Supreme Court found the "general rule" in *Franklin*, did not apply when considering whether Congress waived the United States' sovereign immunity against monetary relief for violating Section 504(a) of the Rehabilitation Act of 1973. *See Lane v. Pena*, 518 U.S. 187, 196-97 (1996).  The Supreme Court noted the defendants in *Franklin*, were nonfederal defendants and that the "Federal Government's sovereign immunity prohibits wholesale application of *Franklin* to actions against the Government to enforce § 504(a)."   *Id.*   In the present case, the Defendants in their official capacities are government defendants, unlike the defendants in *Franklin, supra*.  Similar to the Supreme Court in *Lane, supra*, the Court does not find the presumption in *Franklin* regarding the extent of available remedies is applicable when determining whether Congress has validly required States to waive their sovereign immunity for monetary damages by accepting federal funds.

19

For the reasons set forth above, the Court concludes the State of South Dakota's Eleventh Amendment immunity is waived under the Equalization Act, 42 U.S.C. § 2000d-7(a), due to its acceptance of federal prison funds, and that RLUIPA allows the potential for recovery of monetary damages against the State on his official capacity RLUIPA claims.

### 3. Monetary damages are limited under the PLRA

The Prisoner Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(e), states: "No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." *Id.* Some courts that have held monetary relief is authorized by RLUIPA, also find such damages are limited by the PLRA to the extent the prisoner plaintiff has not made a showing of physical injury in addition to mental or emotional injury. *See Smith*, 502 F.3d at 1269-71 (collecting cases). RLUIPA addresses the application of the PLRA: "Nothing in this chapter shall be construed to amend or repeal the Prison Litigation Reform Act of 1995 (including provisions of law amended by that Act)." 42 U.S.C. § 2000cc-2(e). By this provision, Congress clearly anticipated the PLRA would apply to RLUIPA claims. In the present case, Sisney has not alleged he suffered any physical injury as a result of Defendants' actions in this case. Accordingly, Sisney is limited to recovery of nominal damages on his official capacity RLUIPA claims. *See Royal v. Kautzky*, 375 F.3d 720, 724 (8th Cir. 2004) (holding that an inmate may recover an award of nominal damages under the PLRA despite the lack of a physical injury).

The PLRA further restricts a prevailing prisoner plaintiff to "an award of attorney fees for 150 percent of the damages award." *Royal*, 375 F.3d at 725 (citing 42 U.S.C. § 1997e(d)(2)). "[O]ne dollar is recognized as an appropriate value for nominal damages." *Corpus v. Bennett*, 430 F.3d 912, 916 (8th Cir. 2005). Accordingly, if Sisney recovers $1.00 for nominal damages he will be restricted to recovering $1.50 for his attorney fees. *See id.* In view of the Congressional allowance of substantial attorney fees in other civil cases where nominal or limited damages are awarded, it could be that $1.50 in attorney fees is an unintended consequence.

Punitive damages are also sought on the RLUIPA claims. Even if punitive damages were available on the official capacity RLUIPA claims, which the Court is not deciding in this action, the Court finds no evidentiary basis for an award of punitive damages in this case as there is no evidence in this record that Defendants' actions were "'motivated by evil motive or intent, or ... involve[d] reckless or callous indifference to the federally protected rights'" of Sisney. *Id.* at 724 (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

### D.     Motion to Strike

For various reasons Defendants moved to strike Sisney's Affidavit and attachments, Doc. 247, that were filed in support of his resistance to Defendants' summary judgment motion. The Eighth Circuit explained that in ruling on a summary judgment motion, "[w]e consider only admissible evidence and disregard portions of various affidavits and depositions that were made without personal knowledge, consisted of hearsay, or purported to state legal conclusions as facts." *Murphy*, 372 F.3d at 982. Certain portions of Sisney's Affidavit and attachments contain statements made without personal knowledge, consist of hearsay and purport to state legal conclusions as facts. Rather than strike Sisney's Affidavit and attachments from the record, however, the Court will disregard those portions that are not admissible evidence. Accordingly, Defendants' motion to strike will be denied.

### E.     Merits of RLUIPA Claims

"By enacting RLUIPA, Congress established a statutory free exercise claim encompassing a higher standard of review than that which applies to constitutional free exercise claims." *Murphy*, 372 F.3d at 986. The applicable statute provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –
> > (1) is in furtherance of a compelling governmental interest; and
> > (2) is the least restrictive means of furthering that compelling governmental interest.

21

42 U.S.C. § 2000cc-1(a).  A threshold matter Sisney is required to establish, is that there is a substantial burden on his ability to exercise his religion.  *See* 42 U.S.C. § 2000cc-2(b)[3].  In 2004, the Eighth Circuit held that to meet this threshold showing, the government policy or actions:

> must "significantly inhibit or constrain conduct or expression that manifests some central tenet of a [person's] individual [religious] beliefs; must meaningfully curtail a [person's] ability to express adherence to his or her faith; or must deny a [person] reasonable opportunities to engage in those activities that are fundamental to a [person's] religion."

*Murphy*, 372 F.3d at 988 (quoting *Wier v. Nix*, 114 F.3d 817, 820 (8th Cir. 1997)).  Thus, the Eighth Circuit directed that courts determine whether the conduct or expression constrained by prison officials was a "central tenet" of or "fundamental" to the prisoner's religion.  In *Cutter*, however, the Supreme Court explained that, "RLUIPA bars inquiry into whether a particular belief or practice is 'central' to a prisoner's religion."  544 U.S. at 725 & n. 13 (citing 42 U.S.C. § 2000cc-5(7)(A)).  In determining that courts are not to look to the centrality of the belief or practice, the Supreme Court cited the provision in RLUIPA that defines "religious exercise" to "include any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A).  Accordingly, in determining whether any of the Defendants' policies or actions imposed a substantial burden on Sisney's exercise of his religion, the Court will follow the Supreme Court's direction in *Cutter, supra*, and will not question whether the particular belief or practice Sisney seeks to express or do is central to the exercise of his religion.  That does not mean that just any claimed belief or practice will go without examination.

Sisney contends several governmental policies and actions have imposed a substantial burden on his ability to exercise his religion, which will each be examined below to determine whether

---

[3]42 U.S.C. § 2000cc-2(b), provides as follows:
If a plaintiff produces prima facie evidence to support a claim alleging a violation of the Free Exercise Clause or a violation of section 2000cc of this title, the government shall bear the burden of persuasion on any element of the claim, except that the plaintiff shall bear the burden of persuasion on whether the law (including a regulation) or government practice that is challenged by the claim substantially burdens the plaintiff's exercise of religion.

Sisney has met the threshold showing and, if so, the Court will determine whether there is any genuine issue of material fact remaining for trial on whether Defendants have met their burden of persuasion under RLUIPA. Defendants contend that Sisney's professed religious beliefs are not sincerely held, and the Court finds based upon all the evidence in this case that there is a genuine issue of material fact remaining for trial on the sincerity of Sisney's religious beliefs.

### 1. Succah or Sukkot Booth

One of Sisney's primary claims is that he has not been allowed to use a succah or Sukkot Booth during the feast of Sukkot. A succah is a booth in which individuals practicing Judaism eat their meals during the one-week feast of Sukkot. Sisney does not own a succah, but one was donated to the Jewish inmates at the SDSP by some inmates at the Mike Durfee State Prison in Springfield, South Dakota, a separate South Dakota Department of Corrections ("SDDOC") facility. The succah donated to the SDSP Jewish group has a metal frame, to which canvass is attached to make it a three-sided booth. Only one person can fit in the booth at any one time.

In a Project Application filed on June 17, 2003, Sisney requested that the Jewish inmates be allowed to erect a succah outdoors in the SDSP's recreation yard and eat their meals in the succah. Alternatively, Sisney asked that the Jewish inmates eat their meals at the normal time and place but be given additional time at the end of the day to recite special prayers. Sisney states that he had already been told by Wagner that his request for a succah would be denied before he filed the Project Application, so he decided to include the alternate request to at least be given additional prayer time. (Sisney Affidavit, Doc. 247 ¶¶ 49, 64.)

Sisney produced affidavits from two inmates who were confined in the Mike Durfee State Prison, during September 2002, who observed an inmate, Phillip Heftel, erect a succah. (Sisney Affidavit, Doc. 247, Ex. E.) Heftel, also an inmate who practices Judaism, entered into a settlement agreement with the SDDOC and its employees in February 2000, regarding several aspects of Heftel's practice of the Jewish religion. Even if Sisney were found to be a third-party beneficiary of this agreement, use of a succah was not specifically discussed in the Settlement Agreement.

23

Sisney's request for use of a succah was denied by Defendant Block. But Sisney was granted additional time each evening to meet and recite special prayers during the feast of Sukkot. Sisney renewed his request to use a succah in his Project Application relating to High Holy Days for 2004. (Sisney Affidavit, Doc. 247, Ex. Y.) The Project Application requested a time to set up the Sukkot Booth and to consume the lunch meal in the succah for seven days. The request to erect a succah in the 2004 Projection Application was denied for the following reasons:

> SDSP Policy prohibits the inmate-to-inmate transfer of property. The Springfield inmates [at the Mike Durfee State Prison] may not give you a booth. We also examined the booth from Springfield and determined that its placement in the prison yard creates numerous safety, security and staffing problems. Such problems include, but are not limited to, the following:
>
> a. The booth constitutes a security threat because the poles could be used as weapons, or inmates in the booth are shielded from the view of officers that would conceal from view illicit and prohibited activities. Unlike the Native American Sweatlodge, the Sukkah is intended to be temporary and can easily be torn apart and does not protect against all forms of weather.
>
> b. Staffing and logistics surrounding dining and recreation time makes it impossible to facilitate the request to eat meals in the yard;
>
> c. Policy prevents inmates from possessing food or eating meals in the yard;
>
> d. The booth is not large enough to accommodate all of the Jewish inmates;

(Sisney Affidavit, Doc. 247, Ex. Y.) The response to the Project Application further states "[a]s an accommodation, the Jewish inmates are granted one half hour each day of Sukkot to recite the blessings over the four species every evening of Sukkot from 4:45 pm - 5:15 pm in the Phone Room." (*Id.*) Sisney renewed his request to use a succah in 2005 and 2006, but he has not been allowed to erect and use a succah. (*Id.*)

The evidence produced by Sisney satisfies his burden of showing, as a threshold matter, that the denial of a Sukkot Booth is a substantial burden on Sisney's ability to exercise his religion. Sisney has produced "prima facie evidence to support a claim alleging ... a violation of [42 U.S.C. §] 2000cc" as to the denial of a Sukkot Booth in the years 2004, 2005 and 2006. 42 U.S.C. § 2000cc-2(b). Accordingly, the burden of persuasion, as well as the burden to establish the absence

24

of any genuine issue of material fact, shifts to Defendants on the issue of whether denial of the Sukkot Booth was the least restrictive means to further a compelling governmental interest.

Defendants' suggestion that Sisney's Project Application "was essentially a request that the state provide [a Sukkah] to the inmates free of charge", Doc. 216 at p. 17, is a red herring. Sisney has not suggested that the SDDOC provide him a Sukkot Booth at no charge. Rather, Sisney seeks to utilize the Sukkot Booth that was donated to him and other inmates practicing the Jewish faith.

Defendants assert the denial of a Sukkot Booth was based on compelling concerns of institutional safety, order, and security. While the Court acknowledges the Defendants have a compelling interest in institutional security, "[n]evertheless, [they] must do more than merely assert a security concern." *Murphy*, 372 F.3d at 988. The Eighth Circuit explained, "[a]lthough we give prison officials 'wide latitude within which to make appropriate limitations, they 'must do more than offer conclusory statements and post hoc rationalizations for their conduct.'" *Id.* at 988-89 (quoting *Hamilton v. Schriro*, 74 F.3d 1545 (8th Cir. 1996)). In the rejection of Sisney's request to use the succah, Block compared the succah to the Native American sweatlodge. Sisney contends a Sukkot Booth poses significantly less security risk than the Native American sweatlodge that is maintained in the recreation yard and used by hundreds of Native American inmates. Although the poles from the succah could be used as weapons if the canvass was removed from them, Sisney produced evidence that there are metal rakes, shovels and other tools in the sweatlodge that would provide a greater security risk because of their ease of accessibility to inmates. Moreover, the succah is used only seven days per year, but the sweatlodge is used by inmates year around.

Allowing inmates to transfer property to other inmates is a security concern raised by Defendants in relation to the Sukkot Booth, because the booth Sisney desires to use was donated by other inmates. To eliminate the risk of inmates transferring contraband, SDSP officials may throughly examine the donated succah to ensure no contraband is concealed in it before allowing Sisney access to the booth.

Another security concern asserted by Defendants is the inability to view the Jewish inmates at all times in the recreation yard.  This reason is questionable given that inmates using the sweatlodge are fully concealed from SDSP officers with no correctional staff supervision in the sweatlodge.  The succah has only three sides, allowing correctional staff to view the inmate sitting in the succah.  In the denial of Sisney's request to use the donated succah, Block states it is "impossible" to facilitate the request to eat meals in the yard during dining time.  Sisney, however, did not request to eat meals in the recreation yard during dining time.  Rather, he requested to eat meals in the succah during regular recreation time.

Based upon the existing record and the discussion above, the Court finds there is a genuine issue of material fact remaining for trial on the issue of whether denial of a succah or Sukkot Booth in 2003 through 2006 was the least restrictive means of furthering SDDOC's compelling governmental interests.  Defendants Reisch, Weber, Block, and Wagner were involved in the denial of a succah to Sisney.  Reisch was made personally aware of the denial of a succah by Sisney's letters to him.  Warden Weber was involved in denial of a succah because in his capacity as Warden of the SDSP he denied Sisney's Request for Administrative Remedy to allow him to use a succah in the exercise of his religion.  Block denied Sisney's Project Applications to use a succah.  Wagner was involved in the process of determining whether to allow Sisney to use a succah and is the SDSP official charged with carrying out her superiors' denials of Sisney's use of a succah.  Accordingly, summary judgment will be denied on the official capacity RLUIPA claims against Defendants Reisch, Weber, Block, and Wagner for denial of a Sukkot Booth to Sisney in 2003 to 2006.

**2. Jewish Chapel and Additional Service Time**

In July 2003, Sisney submitted a Project Application requesting that one specific room with access to the Jewish group's locker box be designated as the Jewish Chapel area, which would be the permanent place for the Jewish group to conduct their weekly services. (Wagner Affidavit, Doc. 219, Ex. I.)  He also asked for access to a TV/VCR as needed for services.  He contends that lack of a permanent place to conduct the Jewish group's weekly services substantially burdened the practice of his religion because he did not have access to required materials when needed during the

services.  Inmates are given five minutes prior to a service to obtain the items they need for the service and then they are not allowed access to the locker box after that time, until the last five minutes of the service to return items to the locker box.  Having one designated room, wherein their locker box is stored, would allow the Jewish group access to the group's worship items during the services.

Defendants Block and Weber denied Sisney's request for designating one room for the Jewish group to conduct services and for their locker box to be in the same room.  (Wagner Affidavit, Doc. 219 at Ex. I.)  The reason Defendant Block denied this request was that all of the SDSP's rooms are available to all of the religious groups.  (*Id.*)  In his Administrative Remedy Response, Defendant Weber reiterated that all of the rooms are available to all inmate groups and that "[o]ther inmate groups that may use the room may tamper with your storage locker.  At the present time, the storage locker is kept in a closet, in the phone room, whose door is constantly locked.  You are asking for special treatment."  (*Id.*)  In their brief, Defendants maintain that Sisney was requesting an "exclusive" room for the Jewish Chapel and that this would have provided the Jewish group with "preferential treatment."  (Doc. 216 at p. 21-22.)

The Court notes that Sisney did not request an *exclusive* room for the Jewish services.  Rather, he requested that one room be designated for the place that all Jewish services would be held.  He did not request exclusion of all other inmate religious groups from this same room.  In any event, Sisney testified in his deposition that the Jewish group had sufficient space for their services and that the lack of a permanently designated room for Jewish services did not prevent him from practicing his religion. (Sisney Depo., Doc. 218, Ex. A at p. 353-54.)  Moreover, to ensure they have all items needed for a particular service, the Jewish group can take all items from the locker box to the designated room for each service.  The Court does not find Sisney has met his threshold burden of showing the denial of a permanent space for Jewish services at the SDSP imposed a substantial burden on the exercise of his religion and Defendants are entitled to summary judgment on this claim.

Another request from Sisney was for additional time to conduct group Torah, Kabalistic and language studies. Sisney does have access to his personal religious books in his cell, but does not have access to the Jewish group's religious books maintained in their locker except during regularly scheduled services on Friday and Saturday evenings. The services on Friday are Shabbat services and on Saturday are Havdolah services and Torah readings. He maintains, however, that these group service times do not allow the Jewish group sufficient time to conduct group Torah, Kabalistic and language studies because the entire time on Friday and Saturday evenings are consumed by setting up for those two services, conducting the services and cleaning up after the services. He pointed out in his Project Application that the other religious groups have significantly more service times available, including 6 periods per week for Native Americans, 10 periods per week for Catholics and 8 times per week for Christians. (Wagner Affidavit, Doc. 219, Ex. M.) This request for additional group time was denied by Defendant Block on July 31, 2003 by stating: "You have ample time during Shabbat Service to study Torah." (*Id.*) It was again denied by Warden Weber in an Administrative Remedy Response dated August 27, 2003. (*Id.*)

The Court finds Sisney has produced sufficient evidence to meet his threshold burden of showing denial of an additional period of time for group study of the Torah, Kabalistic and language studies imposed a substantial burden on the exercise of his religion. The burden then shifts to the Defendants on Sisney's RLUIPA claim.

Defendants have not identified a security interest that could be found to be a compelling governmental interest for refusing additional congregate time for Torah, Kabalistic and language studies. It appears the interest they are asserting is treating all religious inmate groups equally with no preferential treatment to any one group. Defendants cite *Baranowski v. Hart*, 2005 WL 1667820, (S.D.Tex. Jul. 15, 2005), *aff'd* 486 F.3d 112 (5th Cir. 2007), in support of their claims that Sisney has failed to show denial of additional service time is a substantial burden on the exercise of his religion. The Court rejects the holding and rationale in *Baranowski*, however, as that court held the prison officials' refusal to provide a kosher diet to the plaintiff, an inmate practicing the Jewish faith, did not violate the First Amendment or RLUIPA. *See id.* at * 7. This is an untenable holding that

28

has not been accepted by other district courts in the Eighth Circuit. *See Toler*, 2007 WL 2238661, at *3-4 (denying prison officials' motion for summary judgment on prisoner's claim that refusal to provide kosher diet violated RLUIPA); *El-Tabech*, 2007 WL 1487148 (D.Neb. 2007) (same). Defendants don't appear to contest that refusal to provide a kosher diet would violate RLUIPA. Accordingly, the Court is unpersuaded by the decision in *Baranowski, supra*.

It appears from the inmate religious gathering schedule that other religions are provided more service times than the Jewish inmates. (Doc. 247, Ex. FF.) Although the Defendants contend the reason for these additional time periods is that there are significantly more inmates observing the religions that are given more time periods for group services, it appears inmates are free to attend as many of the offered services as they desire with the exception of certain Native American gatherings and the Cornerstone Bible Study. (*Id.*) In addition to group service times, it likewise appears from the schedule that other inmates are given time for group religious text studies. (*Id.*). The Court does not find Defendants have produced evidence of a compelling governmental interest for refusing to allow additional congregate time for Torah, Kabalistic and language studies. Even if there was a compelling governmental interest, the Court finds there are genuine issues of material fact regarding whether Defendants' refusal of an additional time period for Torah, Kabalistic and language studies is the least restrictive means of furthering any compelling governmental interest.

### 3. Rabbi

On July 28, 2003, Sisney submitted a Project Application requesting that the SDSP obtain the services of a Rabbi to assist the Jewish group because of "the lack of Rabbis in the Sioux Falls area." (Wagner Affidavit, Doc. 219, Ex. J.) He suggested the Benevolent Fund could be used to pay for the Rabbi visits once or twice per month.

Defendant Block denied this request stating: "The benevolent fund does not reimburse for Rabbis, chaplains, medicine men, etc.. If you need assistance in locating a Rabbi, contact the CAC Office." (Wagner Affidavit, Doc. 219, Ex. J.) The "CAC Office" referred to by Defendant Block, is the Cultural Activities Coordinator, who is currently Defendant Wagner. Defendant Weber denied

Sisney's request for Administrative Remedy on the same grounds the Project Application was denied by Defendant Block.

Defendants did not refuse to allow visits by a Rabbi. Moreover, there is evidence in the record that although her attempts failed, Defendant Wagner did attempt to find a Rabbi in Sioux Falls to assist the Jewish group. Even if the Benevolent Fund could be used to pay for visits by a Rabbi, Sisney has not produced any evidence that he could get a Rabbi to make such visits to the SDSP. Sisney has been able to conduct the Friday and Saturday services without consistent visits from a Rabbi. Although leadership of a Rabbi would presumptively assist Sisney in the exercise of his religion, Sisney has not produced sufficient evidence to show that Defendants' policy or actions imposed a substantial burden on the exercise of his religion. Accordingly, Defendants are entitled to summary judgment on this claim.

### 4. Visit by Rabbinical Students

Sisney alleges Defendants Wagner and Loen violated his rights by interfering with a visit in 2003 that he and Jewish group had with two students studying to become Rabbis. He contends Defendant Wagner prevented him from talking to the students about certain topics, including the use of a succah. He admits Loen did not speak during the meeting. Although Defendants question whether Sisney has asserted a violation of RLUIPA, the Court will construe Sisney's claim regarding the rabbinical student visit as violating his rights under RLUIPA. Similar to the claim regarding visits by a Rabbi, however, Sisney has failed to produce sufficient evidence to meet his threshold burden of showing that Defendants Wagner and Loen's actions during the meeting with the rabbinical students in 2003 imposed a substantial burden on the exercise of his religion.

### 5. Religious Property

In another Project Application submitted on July 28, 2003, Sisney requested that he be allowed to possess or use the following property: 1) succah; 2) charity box; 3) a tape player in his cell to listen to Hebrew language tapes; 4) religious calendars; 5) additional herbs and oils; 6) a lightbulb diffuser to be used in his cell for essential oils; and 7) incense to be used in the chapel area.

(Wagner Affidavit, Doc. 219, Ex. C.)  All of these requests were denied by Defendant Block, and he noted that Sisney had access to a charity box in the chapel. (*Id.*)  It was also noted that Sisney had access to a tape player in the chapel, but that it could not be used in individual cells. (*Id.*)  In addition to the above property, Sisney requested that he be allowed view what he refers to as the "Jewish Curriculum", which was information regarding Judaism gathered and kept by the Cultural Activities Coordinator.  He also requested that he be allowed to repair his tzit-tzit shirt, a fringed shirt worn by persons practicing Judaism, rather than having to purchase a new tzit-tzit shirt.  These additional requests were denied as well.

    **a. Succah**.  For the same reasons explained above relating to the succah or Sukkot Booth, summary judgment will be denied on this property claim.

    **b. Charity Box.**  Because Sisney had access to a charity box in the chapel, he has not met his burden to show Defendants' policy or actions imposed a substantial burden on the exercise of his religion and summary judgment will be granted on this claim.

    **c. Tape player.**  Sisney seeks the use of a tape player to allow him to study the Hebrew language.  The Jewish group was denied additional congregate time in the chapel area for language studies and Sisney contends the current congregate time does not allow sufficient time for language studies in addition to conducting services.  The Court found above that Sisney has met his threshold burden of establishing a substantial burden on the exercise of his religion for denying additional congregate time for Torah, Kabalistic and language studies and that Defendants did not meet their burden of proof on this RLUIPA claim.  The request for the tape player for purposes of language studies is related to the request for additional language study time.  Defendants state that no inmates are allowed to possess tape players in their cells, but Defendants have offered no evidence regarding the reason for this policy.  Moreover, that no inmates are allowed to possess tape players does not end the inquiry.  RLUIPA specifically prohibits Defendants from imposing a substantial burden on the exercise of Sisney's religion "even if the burden results from a rule of general applicability" unless the Defendants meet their burden of proof under RLUIPA.  42 U.S.C. 2000cc-1(a).  At this

point in the proceedings, the Court finds Sisney has produced sufficient evidence to meet his threshold burden of showing the denial of a tape player or sufficient time to use the tape player imposed a substantial burden on the exercise of his religion and Defendants have not met their burden of showing an absence of a genuine issue of material fact that denial of a tape player is the least restrictive means of furthering a compelling governmental interest.

**d. Religious Calendar**.  Sisney has not produced sufficient evidence to establish that denial of a commercially-prepared Jewish religious calendar substantially burdened the exercise of his religion.  He is allowed to make his own calendar and has not been denied access to materials from which he can learn the dates of religious holidays.  Defendants are entitled to summary judgment on this claim.

**e. Herbs, Oils and Incense.**  Defendants contend Sisney's claim relating to denial of herbs and oils is time barred because it was first denied in 2000.  This argument is unavailing, however, because Sisney again requested such herbs and oils in his Project Application, dated July 28, 2003, and the 2003 request is the basis for his claims in this action.  Defendants contend Sisney admitted the requested herbs and oils were not "required to practice Judaism".  (Doc. 216 at p. 33.)  In Sisney's Answers to Interrogatories and Requests for Production, Sisney stated: "Plaintiff knows of no books which state oils and herbs are required to practice Judaism.  Tradition and practice show that oils and herbs are used by custom in many Jewish observances." (Doc. 218, Ex. C at p. 5.)  In his Affidavit, Sisney states "Judaism itself uses a variety of herbs and oils as specified in the Torah, Siddur and traditional ceremonies like Havdolah." (Sisney Affidavit, Doc. 247 at ¶ 82.)  Other than Sisney's Affidavit, however, there is no evidence establishing how herbs and oils enhance Sisney's exercise of his Jewish faith.  Sisney had failed to meet his threshold burden of establishing the denial of herbs and oils imposes a substantial burden on the exercise of his religion.

In addition to requesting herbs and oils to practice Judaism, Sisney seeks herbs and oils to practice Kabbalah, which he describes as "a religious belief system rich in ideas and tradition." (Sisney Affidavit, Doc. 247 at ¶ 82.)  Sisney, however, has not produced sufficient evidence to carry

32

his threshold burden of establishing that denial of herbs and oils to practice Kabbalah imposes a substantial burden on the exercise of his religion.

Sisney also requested to burn incense in the chapel area. He has failed, however, to meet his threshold burden of establishing that inability to burn incense imposes a substantial burden on the exercise of his religion. Accordingly, Defendants are entitled to summary judgment on Sisney's RLUIPA claims regarding denial of incense and denial of herbs and oils in the 2003 Project Application.

**f. Lightbulb Diffuser.** Sisney requested that he be allowed to possess and use a lightbulb diffuser to use oils and burn herbs in his cell. Defendants denied this request because such diffusers pose a serious fire hazard, other inmates and staff may be allergic to the fumes they emit or find the aroma offensive and they can be used to conceal prohibited activities such a smoking. The Court does find Defendants' proffered reasons for denial of the lightbulb diffuser appear to be the least restrictive means for furthering a compelling governmental interest. Also, in light of the dismissal of Sisney's claim regarding herbs and oils, Defendants are entitled to summary judgment on Sisney's RLUIPA claim for denial of a lightbulb diffuser because this action does not impose a substantial burden on the exercise of Sisney's religion.

**g. Jewish Curriculum.** Sisney's request to view information Defendant Wagner had in her possession regarding the practice of Judaism was initially granted by Defendant Weber. Wagner, however, imposed several conditions before Sisney would be allowed to view these materials. Sisney claims he complied with those conditions and Wagner denies Sisney complied with the conditions. This dispute of fact is immaterial, however, because there is no dispute that at some point during the pendency of this lawsuit Sisney was furnished a full and complete copy of the Jewish curriculum. Accordingly, this claim is moot and Defendants are entitled to summary judgment on this claim.

33

**h. Tzit-tzit Shirt.**  Sisney requested that he be allowed to purchase string to repair the frayed fringes on his tzit-tzit shirt rather than having to purchase a new one.  Defendants Block and Slykhuis were the only SDSP officials involved in the denial of this request.  The reason given for the denial is that "[s]tring is not an approved item for any group's religious property." (Slykhuis Affidavit, Doc. 221 at Ex. D.)  The penological interest advanced by Defendants for this denial is a security interest because the string can be used as a weapon.  The Court does not reach the issue of whether this is the least restrictive means for furthering a compelling governmental security interest, because Sisney has failed to meet his threshold burden of showing denial of the replacement string imposed a substantial burden on the exercise of his religion.  Sisney has not been denied the ability to wear his tzit-tzit shirt and he has not produced any evidence to dispute Slykhuis' Affidavit that Sisney had sufficient funds to purchase a replacement tzit-tzit shirt if he so desired.  Summary judgment will be granted to all Defendants on this claim.

**F.     Constitutionality of RLUIPA**

Having concluded that Defendants are not entitled to summary judgment on all of Sisney's RLUIPA claims, Defendants' constitutional challenge to RLUIPA must be considered by the Court. Defendants contend Congress exceeded its powers under the Commerce Clause and the Spending Clause in enacting RLUIPA.  They also contend RLUIPA violates the separation of powers doctrine. Sisney and the United States, as intervenor, maintain that RLUIPA does not violate any constitutional provisions and, therefore, should be upheld as a valid act of Congress.

The Supreme Court held that RLUIPA does not violate the Establishment Clause.  *See Cutter*, 544 U.S. at 719-21.  Although the Supreme Court acknowledged issues concerning RLUIPA's constitutionality under the Spending and Commerce Clauses, it did not resolve these issues in *Cutter*.  *See* 544 U.S. at 718 & n. 7.  The Eighth Circuit has not ruled on the constitutionality of RLUIPA under the Spending or Commerce Clauses.  Numerous courts have upheld the constitutionality of RLUIPA under the First and Tenth Amendments, the Spending and Commerce Clauses and the separation of powers doctrine.  *See Madison*, 474 F.3d at 124 (holding RLUIPA constitutional as a proper exercise of Congress' Spending Clause power); *Benning*, 391

34

F.3d at 1303 (rejecting constitutional challenges to RLUIPA based upon First and Tenth Amendments and finding Congress validly exercised its authority under the Spending Clause); *Charles*, 348 F.3d at 609 (rejecting constitutional challenges to RLUIPA based upon First and Tenth Amendments and the Spending Clause); *Mayweathers v. Newland*, 314 F.3d 1062 (9th Cir. 2002), cert. denied, *Alameida v. Mayweathers*, 540 U.S. 815 (2003) (same and also rejecting constitutional challenge under separation of powers doctrine).

For the reasons set forth below, the Court concludes RLUIPA is a valid exercise of Congress' power under the Spending Clause, and, therefore, the Court need not address Defendants' other constitutional challenges. *See Benning*, 391 F.3d at 1304 (recognizing that courts need not resolve both a Spending Clause and Commerce Clause challenge to legislation "so long as Congress validly exercised either source of authority."); *Mayweathers*, 314 F.3d at 1068 & n. 2; *Madison*, 474 F.3d at 126 & n. 1; *Charles*, 348 F.3d at 609 ("Because we find that RLUIPA is valid under the Spending Clause, we need not involve ourselves in arguments concerning the Commerce Clause.")..

The Constitution grants Congress the authority to "lay and collect taxes, duties, imposts and excises, to pay the debts and provide for the common defense and general welfare of the United States." U.S. Const. Art. I, § 8, cl. 1. "Incident to this power, Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). The Supreme Court has, however, "placed several restrictions upon Congress' authority to persuade" a State to conform to federal policy choices. *Madison*, 474 F.3d at 124. RLUIPA must meet several requirements to be a valid exercise of Congress' power under the Spending Clause:

> (1) the exercise of the spending power must be for the general welfare, (2) the conditions must be stated unambiguously, (3) the conditions must bear some relationship to the purpose of the federal spending, (4) the conditions must not violate some other constitutional command, and (5) the financial inducement offered by Congress must not be so coercive as to pass the point at which pressure turns into compulsion.

35

*Madison*, 474 F.3d at 124 (quotation marks and citations omitted). Defendants admit that South Dakota accepts federal funding for its prisons. *See* Bollinger Affidavit, Doc. 225 at Ex. B. Thus, RLUIPA applies to institutionalized persons in South Dakota. *See* 42 U.S.C. § 2000cc-1(b)(1).

The first requirement, that the exercise of the spending power must be for the general welfare, is satisfied in this case. The Supreme Court recognized that, "[b]efore enacting § 3 [of RLUIPA], Congress documented, in hearings spanning three years, that 'frivolous or arbitrary' barriers impeded institutionalized persons' religious exercise." *Cutter*, 544 U.S. at 716 (citations omitted). The Fourth Circuit found Congress' efforts to protect religious rights and promote rehabilitation were for the general welfare:

> Here, Congress sought to protect prisoners' religious liberty from unjustified and substantial burdens, *see Cutter*, 544 U.S. at 716-17, and we have no trouble concluding that RLUIPA's "attempt to protect prisoners' religious rights and to promote the rehabilitation of prisoners falls squarely within Congress' pursuit of the general welfare." *Charles*, 348 F.3d at 607.

*Madison*, 474 F.3d at 125. The Ninth Circuit also found RLUIPA promotes the general welfare. *See Mayweathers*, 314 F.3d at 1066-67. In reaching this conclusion, the Ninth Circuit recognized the First Amendment's protection of the free exercise of religion "demonstrates the great value placed on protecting religious worship from impermissible government intrusion." *Id.* In addition, the Ninth Circuit found that, "RLUIPA follows a long tradition of federal legislation designed to guard against unfair bias and infringement on fundamental freedoms." *Id.* at 1067. The Court agrees with the Fourth, Seventh and Ninth Circuit's that RLUIPA promotes the general welfare. *See Madison*, 474 F.3d at 124-25; *Charles*, 348 F.3d at 607; *Mayweathers*, 314 F.3d at 1066-67.

RLUIPA satisfies the second requirement that the conditions on the receipt of federal funding must be stated unambiguously. It is clear that RLUIPA applies to "any case in which the substantial burden is imposed in a program or activity that receives Federal financial assistance." 42 U.S.C. § 2000cc-1(b)(1). Moreover, the plain language of RLUIPA sets forth the conditions on which governments accept federal prison funds:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution ... even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person –

    (1) is in furtherance of a compelling governmental interest; and

    (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).  States and their agencies and departments are explicitly included in the definition of "government" under RLUIPA.  *See* 42 U.S.C. § 2000cc-5(4)(A).  The Fourth, Eleventh, Seventh and Ninth Circuits found RLUIPA satisfies the second requirement for a valid exercise of Congress' Spending Clause authority, and the Court agrees.  *See Madison*, 474 F.3d at 125; *Benning*, 391 F.3d at 1305-07; *Charles*, 348 F.3d at 607-08; *Mayweathers*, 314 F.3d at 1067.

The third Spending Clause requirement, that the conditions bear some relationship to the purpose of the federal spending, is easily satisfied in this case.  "Both the protection of the religious exercise of prisoners and their rehabilitation are rational goals of Congress, and those goals are related to the use of federal funds for state prisons." *Benning*, 391 F.3d at 1308; *see Madison*, 474 F.3d at 126; *Charles*, 348 F.3d at 608-09 ("Congress has an interest in allocating federal funds to institutions that do not engage in discriminatory behavior or in conduct that infringes impermissibly upon individual liberties."); *Mayweathers*, 314 F.3d at 1067.

Pursuant to the fourth requirement, the conditions imposed by RLUIPA must not violate some other constitutional command.  This requirement "stands for the 'unexceptional proposition' that the Spending Clause 'may not be used to induce the States to engage in activities that would themselves be unconstitutional.'" *Madison*, 474 F.3d at 127.  The Court does not find that RLUIPA induces South Dakota to engage in any unconstitutional activities.  Contrary to Defendants' position, South Dakota's compliance with RLUIPA does not violate the Establishment Clause, the Tenth Amendment, or the separation of powers doctrine.  The Supreme Court held that RLUIPA does not violate the Establishment Clause. *Cutter*, 544 U.S. at 719-21.  Moreover, "when Congress engages in a constitutional use of its delegated Article I powers, the Tenth Amendment does not reserve that

37

power to the States." *Charles*, 348 F.3d at 609. Defendants advance the same separation of powers argument rejected in *Mayweathers*, 314 F.3d at 1070. As recognized by the Ninth Circuit, however, "RLUIPA provides additional protection for religious worship, respecting that [*Employment Division v. Smith*, 494 U.S. 872, 890 (1990)] set only a constitutional floor - not a ceiling - for the protection of personal liberty. *Smith* explicitly left heightened legislative protection for religious worship to the political branches. *Smith*, 494 U.S. at 890, 110 S.Ct. 1595." *Mayweathers*, 314 F.3d at 1070. Like the Fourth Circuit, the Court concludes that, "[b]ecause RLUIPA does not induce the States to engage in unconstitutional activities, it does not impose an unconstitutional condition." *Id.*

The final requirement for legislation to satisfy the Spending Clause is that "the financial inducement offered by Congress must not be so coercive as to pass the point at which pressure turns into compulsion." *Madison*, 474 F.3d at 124. Defendants maintain that RLUIPA is clearly coercive because South Dakota would have to reject 100% of the federal prison funds if it chose not to be subject to the standard of review in RLUIPA. This argument was rejected by the Fourth Circuit in light of the small portion of the state's prison budget that was contributed by the federal government. *See Madison*, 474 F.3d at 128. In *Madison*, federal prison funds were 1.3% of the Virginia Department of Corrections' 2005 budget. *See id.* In the present case, Defendants assert the federal government has supplied 9.5% to 17.35% of SDDOC's annual budget over a six-year period of time. *See* Bollinger Affidavit, Doc. 225 at Ex. B. This averages approximately 14.4% of SDDOC's annual budget. Defendants contend, "Federal funds are essential to [SDDOC]'s ability to effectively manage its programs and services, and to provide for the safety and security of inmates and staff." Bollinger Affidavit, Doc. 225 at ¶ 11. The percentage of South Dakota's prison budget is higher than the percentages at issue in *Madison*, 474 F.3d at 124 (1.3%), *Charles*, 348 F.3d at 609 (1.6%), and *Mayweathers*, 314 F.3d at 1069 & n. 3 (less than 1%), and Defendants advocate that, "no court has ever held that the potential loss of 17% of a state's federal funding for corrections is acceptable under the Spending Clause." Doc. 274 at p. 13. Defendant, however, do not address the Eighth Circuit's decision in *Jim C. v. United States*, 235 F.3d 1079 (8th Cir. 2000), in advocating this position.

38

In *Jim C.*, the Eighth Circuit rejected a Spending Clause argument in holding that Arkansas was not coerced into waiving its Eleventh Amendment immunity as to the Arkansas Department of Education by accepting federal funds amounting to 12% of the Department's budget. 235 F.3d at 1082. The federal legislation being challenged on Spending Clause grounds in *Jim C.* was Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. *See Jim C.*, 235 F.3d at 1080. That RLUIPA is being challenged here does not alter the precedential value of *Jim C.*'s coercion analysis under the Spending Clause. The total amount of annual federal funds the Arkansas Department of Education would have had to forego in making its decision at issue in *Jim C.* was $250 million, which is significantly more than the highest annual amount of $13,398,734 South Dakota would have had to forego to avoid application of RLUIPA. *See* Bollinger Affidavit, Doc. 225 at Ex. B. Similar to the 12% of Arkansas' annual education budget, the average percentage of approximately 14.4% of South Dakota's corrections' budget it would have to decline to avoid application of RLUIPA, "would be politically painful," but the Court cannot conclude that it compels South Dakota's choice. *Jim C.*, 235 F.3d at 1082.

Having examined all of the requirements, the Court concludes Congress has not exceeded its authority under the Spending Clause in enacting RLUIPA. And RLUIPA does not violate the Establishment Clause, the Tenth Amendment or the separation of powers doctrine. Accordingly, Defendants' summary judgment motion will be denied to the extent it challenges the constitutionality of RLUIPA.

## G.    First Amendment

Sisney asserts that, in addition to violating RLUIPA, all of the burdens imposed on the exercise of his religion discussed above violate his rights under the Free Exercise Clause of the First Amendment. If Defendants are entitled to summary judgment on the merits under the more onerous strict scrutiny standard that applies to RLUIPA claims, they are also entitled to summary judgment under the more lenient standard that applies to First Amendment claims. Thus, on all claims Defendants were granted summary judgment under RLUIPA on the merits, they are likewise granted summary judgment on First Amendment grounds. As to the remaining claims, however, the Court

will determine whether Defendants are entitled to summary judgment on First Amendment grounds because unlike under RLUIPA, Defendants can be held liable in their individual capacities under the First Amendment. In light of Sisney's failure to allege any physical injury caused by any alleged First Amendment violation, however, Sisney cannot recover more than nominal and punitive damages due to the limitations in the PLRA. *See* 42 U.S.C. § 1997e(e); *Royal*, 375 F.3d at 723 (holding that the PLRA's limit on damages for mental or emotional injury applies to First Amendment claims). As to Sisney's claim for punitive damages, however, the Court concludes that there is no basis for an award of punitive damages in this case and summary judgment will be granted on that prayer for relief. *See Royal*, 375 F.3d at 724 (holding that "[a] factfinder may assess punitive damages in a section 1983 action when a 'defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others.'") (quoting *Smith v. Wade*, 461 U.S. 30, 56 (1983)).

The claims on which summary judgment was not granted to Defendants under RLUIPA are: (1) denial of a Sukkot Booth; (2) denial of additional time to conduct group Torah, Kabalistic and language studies; and (3) denial of use of a tape player for language studies in Sisney's cell. These claims will be evaluated under the First Amendment standard. As mentioned above in the discussion of individual and official capacity claims, the only claims remaining under 42 U.S.C. § 1983 are official capacity claims for injunctive relief and individual capacity claims for monetary damages. As to the individual capacity claims, the Court must also consider Defendants' qualified immunity defense.

Although prisoners do not lose all of their constitutional rights upon incarceration, "'[t]he fact of confinement and the needs of the penal institution impose limitations on constitutional rights, including those derived from the First Amendment, which are implicit in incarceration.'" *Hamilton v. Schriro*, 74 F.3d 1545, 1550 (8th Cir. 1996) (quoting *Jones v. North Carolina Prisoners' Labor Union, Inc.*, 433 U.S. 119, 125 (1977)). "An inmate who challenges the constitutionality of a prison regulation or policy that limits the practice of religion must first establish that it infringes upon a sincerely held religious belief." *Id.* In a footnote in their brief, Defendants's position on this issue

is that the Court should "rule Sisney's demands were not motivated by sincerely-held religious beliefs." (Doc. 216 at n.8.)  Sisney has, however, produced sufficient evidence at this stage of the proceedings to establish that his religious beliefs are sincerely held and that Defendants' actions infringed upon those beliefs.  Sisney contends he began learning about and studying Judaism before his incarceration and has been practicing the Jewish faith during his incarceration.  Defendants do not dispute that Sisney regularly participates in the Friday and Saturday evening Jewish services at the SDSP and that he has requested to be placed on a kosher diet.  They do, however, contend Sisney has eaten non-kosher foods from the commissary on a regular basis.  This is an issue that must be resolved by a fact-finder, rather than on summary judgment.

Having made the threshold showings of sincerity and infringement, Sisney's First Amendment claims are evaluated under the four-factor test established by the Supreme Court in *Turner v. Safley*, 482 U.S. 78, 81 (1987).  *See Murphy*, 372 F.3d at 982-83.  Under *Turner*, "[a] prison regulation or action is valid ... even if it restricts a prisoner's constitutional rights if it is 'reasonably related to legitimate penological interests.'" *Id.* (quoting *Turner*, 482 U.S. at 89).  The four factors to be evaluated are:

> First, we ask whether there is a "valid rational connection" between the prison regulation and the government interest justifying it.  Second, we consider whether there is an alternative means available to the prison inmates to exercise the right. Third, we examine whether an accommodation would have a "significant 'ripple effect'" on the guards, other inmates, and prison resources.  Fourth, we evaluate whether there is an alternative that fully accommodates the prisoner "at de minimis cost to valid penological interests."

*Murphy*, 372 F.3d at 982-83 (internal citations omitted).

### 1. Sukkot Booth

The Sukkot Booth was denied primarily for security reasons.  Sisney seeks to use the Sukkot Booth in the open prison yard during recreation time.  The Sukkot Booth is constructed with metal bars that could be used as weapons.  The Court notes, however, that the metal bars would be secured together by the fabric used for the sides of the booth, making it more difficult to use them as weapons than if the metal bars were not secured to the booth.  The booth would limit the guards'

41

ability to observe an inmate sitting in the booth, but the booth has only three sides, allowing guards to view the inmate sitting in the booth from at least one side. Although the first factor is a close call, given these potential dangers posed by the Sukkot Booth, there is a valid rational connection between denial of the booth and the Defendants' security interest. If a booth is denied, there are no alternative means to exercise that aspect of his religious faith. Sisney did propose that the Jewish group be granted additional time to recite prayers during the feast of Sukkot if a succah would not be allowed, but he did that because Wagner had already informed him the request for a succah would be denied. Defendants granted this alternative request for additional prayer time during the feast of Sukkot. Nevertheless, additional prayer time is not an alternative means of eating meals in a succah. Allowing the use of a Sukkot Booth could require SDSP prison guards to take a few more security precautions for a one week period of time each year, but it does not appear from the record it would impose a significant amount of additional work on guards or that it would require a significant allocation of prison resources to make this accommodation. As to the final *Turner* factor, allowing the use of a Sukkot Booth could be done at a de minimis cost to Defendants' interests as a succah was donated to the SDSP Jewish group and Sisney seeks to use it during regular recreation yard hours when guards are already required by prison regulations to supervise inmates in the yard.

Having examined all of the *Turner* factors, the only one that weighs in favor of the Defendants is the first factor. Based upon the existing record and the discussion above, the Court does not find Defendants are entitled to summary judgment on Sisney's First Amendment claim for denial of the use of a Sukkot Booth. Accordingly, the official capacity claim for injunctive relief will remain for trial. The Court must consider Defendants' qualified immunity defense on the individual capacity claims. Defendants Reisch, Weber, Block and Wagner were the only Defendants involved in the denial of the use of a Sukkot Booth.

The qualified immunity doctrine was explained by the Eighth Circuit in *Tlamka v. Serrell*, 244 F.3d 628, 632 (8th Cir. 2001):

> Qualified immunity protects a governmental official from suit when his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." "What this means in practice is that whether

42

> an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the objective legal reasonableness of the action, assessed in light of the legal rules that were clearly established at the time it was taken."

*Id.* (citations omitted).  The Court must conduct a two-part inquiry in deciding whether a prison official is entitled to qualified immunity: "whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, ... whether that right was clearly established at the time of the alleged violation." *Conn v. Gabbert*, 526 U.S. 286, 290 (1999).  When evaluating a qualified immunity defense at the summary judgment stage, the Court must take as true those facts asserted by plaintiff that are properly supported in the record.  *See Tlamka*, 244 F.3d at 632.  If, however, there is a genuine dispute about the predicate facts material to the qualified immunity issue, the prison officials are not entitled to summary judgment.  *See Pace v. City of Des Moines*, 201 F.3d 1050, 1056 (8th Cir. 2000).

The Supreme Court explained that, "[f]or a constitutional right to be clearly established, its contours, 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.  This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of pre-existing law the unlawfulness must be apparent.'"  *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal citation omitted)).

Sisney has not cited any case law that is similar enough to the denial of the use of a Sukkot Booth to find that a reasonable official would have understood such a denial violated Sisney's First Amendment rights to exercise his religion.  Accordingly, the Court finds Defendants are entitled to summary judgment on the individual capacity claims for denial of the use of a Sukkot Booth.

## 2.  Additional Time Period for Group Studies

Defendants denied additional time to conduct group Torah, Kabalistic and language studies because the group was allowed to meet on Friday and Saturday evenings each week and this amount of time was determined to be adequate by Defendants Wagner, Block and Weber.  The Jewish group

meets for 3 hours each week and is also permitted to meet for group worship on special religious holidays. Defendants argue this amount of time is ample time to conduct both group services and engage in group Torah and language studies. The only reason the Court could discern from the record in this case for denial of additional meeting time relates to allocation of "scarce administrative and correctional resources." (Wagner Affidavit, Doc. 219 at ¶ 91.) There may be a valid rational connection between denial of additional group activities and the allocation of prison resources, but the record in this case does not explain what that connection is. There are alternative means for Sisney to conduct Torah, Kabalistic and language studies because he may engage in individual study in his cell. Moreover, although Sisney may not have a dedicated time for group study, he does have an opportunity to discuss such issues with fellow inmates practicing the Jewish faith two times per week. Defendants did not produce any evidence to establish what effect granting additional time for these studies would have on guards, other inmates and prison resources. The cost to fully accommodate Sisney's request are not explained on the current record. Based upon the current record, the Court cannot determine on summary judgment whether denial of additional time to conduct group Torah, Kabalistic and language studies is reasonably related to any legitimate penological interest. Only Defendants Wagner, Block and Weber were directly involved in the denial of Sisney's request for additional time, and thus all other Defendants are entitled to summary judgment in their individual and official capacities on this claim. For the reasons set forth above, Defendants Wagner, Block and Weber are not entitled to summary judgment on this claim in their official capacities.

As to the individual capacity claims, Defendants Wagner, Block and Weber assert the defense of qualified immunity on Sisney's First Amendment claims. None of the predicate facts material to the qualified immunity issue are in dispute on this claim. The Eighth Circuit has upheld restrictions on group inmate religious gatherings, *see Murphy*, 372 F.3d at 982-84, and at least one district court in the Eighth Circuit has upheld restrictions on the number of weekly group religious inmate gatherings, *see Harris v. Moore*, 2007 WL 4380277, at *6-7 (E.D.Mo. Dec. 13, 2007). Sisney has not cited to any authority establishing he had a clearly established First Amendment right to meet with other inmates for more than three hours each week to engage in religious studies. In light of

preexisting law, the Court does not find it would have been sufficiently clear to a reasonable prison official that denial of this additional time period would have violated Sisney's First Amendment rights. Accordingly, the Court finds Defendants Wagner, Block and Weber are entitled to qualified immunity on this claim in their individual capacities.

### 3. Tape Player

The final claim that will be evaluated on First Amendment grounds is the denial of a tape player for use in Sisney's individual cell for the purpose of language studies. Even though there may be such penological interests, Defendants do not offer any penological interest justifying the denial of a tape player for use in Sisney's individual cell. They simply state that no inmates are allowed tape players in their cells and that Sisney has access to a tape player during the three hours each week he meets with the Jewish group for group services. As to alternate means, Sisney has access to a tape player during the Friday and Saturday evening service times, during which he could possibly listen to the language tapes. In addition, he can study the Hebrew language in his cell by using books and publications. Defendants have not produced any evidence to show what effect allowing Sisney to possess a tape player in his cell for study of the Hebrew language would have on guards, other inmates or the allocation of prison resources. There is also no evidence of whether there is an alternative that *fully* accommodates Sisney at de minimis cost to valid penological interests. Based upon the current record, the Court cannot determine on summary judgment whether denial of a tape player is reasonably related to any legitimate penological interest. Only Defendants Wagner, Block and Weber were directly involved in the denial of Sisney's request for a tape player, and thus all other Defendants are entitled to summary judgment in their individual and official capacities on this claim. For the reasons set forth above, Defendants Wagner, Block and Weber are not entitled to summary judgment on this claim in their official capacities.

Defendants cite several cases in which the courts held that denial of an audio or video tape player to an inmate for religious use was not unlawful. *See, e.g., Lindell v. Casperson*, 360 F.Supp.2d 932, 953 (W.D.Wis. 2005); *Keesh v. Smith*, 2006 WL 516793, at *6-7 (N.D.N.Y. Mar. 2, 2006); *Wakefield v. Terhune*, 2000 WL 288392, at *5-6 (N.D.Cal. Mar. 6, 2000). Sisney cites no

authority establishing that it is unlawful to deny a tape player for inmate religious study. In light of preexisting law, the Court does not find it would have been apparent that denial of a tape player for use in his cell would have violated Sisney's First Amendment rights. Accordingly, the Court finds Defendants Wagner, Block and Weber are entitled to qualified immunity on this claim in their individual capacities.

In light of the above discussion, summary judgment will be granted on all of Sisney's First Amendment claims except for the following official capacity claims: (1) the claim against Defendants Reisch, Weber, Block and Wagner for denial of the use of a Sukkot Booth; (2) the claim against Defendants Weber, Block and Wagner for denial of additional time to conduct group Torah, Kabalistic and language studies; (3) the claim against Defendants Weber, Block and Wagner for denial of a tape player to study the Hebrew language. On these remaining claims Sisney might ultimately be entitled to receive injunctive relief but may not recover monetary damages because monetary damages are not recoverable on the official capacity claims under § 1983 and the Defendants are entitled to qualified immunity on the individual capacity First Amendment claims.

## H.    Equal Protection

To prevail on an equal protection claim, Sisney must establish that: "'(1) persons who are similarly situated are treated differently by the government, and (2) that the government has failed to provide a rational basis for the dissimilar treatment.'" *Hosna v. Groose*, 80 F.3d 298, 304 (8th Cir. 1996) (quoting *Moreland v. United States*, 968 F.2d 655, 660 (8th Cir. 1992)). In the context of an equal protection challenge, the Supreme Court held that prison officials may not deny an inmate "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Cruz v. Beto*, 405 U.S. 319, 322 (1972) (per curiam); *see Thomas v. Gunter*, 32 F.3d 1258, 1261 (8th Cir. 1994). The Eighth Circuit further recognized that, "unequal treatment of persons who are 'entitled to be treated alike, is not a denial of equal protection unless there is shown to be present in it an element of intentional or purposeful discrimination.'" *Lewis v. Jacks*, 486 F.3d 1025, 1028 (8th Cir. 2007) (quoting *Batra v. Bd. of Regents of Univ. of Neb.*, 79 F.3d 717, 721 (8th Cir. 1996) (citations omitted)).

### 1. Kosher Coffee

As to Sisney's equal protection claim for failure to provide kosher coffee, Sisney has not produced any evidence that there was an element of intentional or purposeful discrimination involved in this denial. In Slykhuis's Affidavit, Doc. 221, he states he does not know whether kosher instant coffee exists or where to obtain such an item if it did exist. The Court notes, however, that Wagner sent an e-mail to Loen on April 14, 2005, informing Loen that "Folgers, Maxwell house and Nescafe all make kosher instant coffee." (Doc. 247, Ex. N.) But there is no evidence that Slykhuis was made aware of this information.

### 2. Sukkot Booth

Sisney also maintains that denial of a Sukkot Booth to the Jewish inmates, but allowing the Native American inmates to use a sweatlodge is a denial of equal protection. The Court finds there is sufficient evidence on the record to establish at this point in the proceedings that: (1) Sisney is similarly situated to Native American inmates and that he is treated differently by Defendants regarding the use of a Sukkot Booth compared to the use of a sweatlodge; and (2) that the Defendants have failed to provide a rationale basis for the dissimilar treatment. Nevertheless, the Court concludes Defendants are entitled to summary judgment on this equal protection claim because there is no evidence that there was an element of intentional or purposeful discrimination against Sisney for the unequal treatment.

### 3. Tzit-tzit String

An equal protection claim is advanced by Sisney regarding the denial of string to repair his tzit-tzit shirt. He contends Native American inmates are allowed string for their dance costumes and tobacco ties. Even if Sisney could establish he was treated differently and there was no rational basis for the dissimilar treatment, Sisney has failed to offer any evidence of intentional or purposeful discrimination based upon Sisney's religion for Defendants Block and Slykhuis' denial of the tzit-tzit string. Summary judgment will be entered in favor of all Defendants on this equal protection claim.

## I.    Access to the Courts

In explaining the actual injury requirement to show a violation of an inmate's right of access to the courts, the Supreme Court stated:

> The requirement that an inmate alleging a violation of *Bounds [v. Smith,* 430 U.S. 817 (1977)] must show actual injury derives ultimately from the doctrine of standing, a constitutional principle that prevents courts of law from undertaking tasks assigned to the political branches. .... It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur.

*Lewis v. Casey*, 518 U.S. 343, 349 (1996).  In *Lewis*, the Supreme Court explained that *Bounds v. Smith*, 430 U.S. 817 (1977) did not establish a right to a law library or legal assistance; rather, *Bounds* acknowledged the already well-established right of access to the court.  *See Lewis*, 518 U.S. at 350.  The Supreme Court further explained:

> Because *Bounds* did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense. .... Insofar as the right vindicated by *Bounds* is concerned, "meaningful access to the courts is the touchstone," [*Bounds*, 430 U.S.] at 823 (internal quotation marks omitted), and the inmate therefore must go one step further and demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim.  He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint.

*Lewis*, 518 U.S. at 351.

To the extent Sisney is claiming Defendant Slykhuis violated his right of access to the courts, there is no genuine issue of material fact that Sisney suffered any actual injury.  Being denied the publication "The Jailhouse Lawyer's Handbook" did not cause any actual harm to Sisney's right to access the courts.  He was able to file a comprehensive complaint and proceed with his claims in the absence of this publication.  Moreover, Sisney received a copy of this publication in 2007 and is now

48

represented by counsel in this action. Accordingly, Slykhuis is entitled to summary judgment on Sisney's access to the courts claim.

The other access to the courts claim advanced by Sisney is that Defendant Loen denied copies of cases and statutes Sisney requested. Sisney requested copies of the codified versions of RLUIPA, i.e. 42 U.S.C. § 2000cc *et seq.*, but he possessed the Public Law version of RLUIPA. Sisney cited the relevant provisions of RLUIPA in nearly every one of his written communications with Defendants. Sisney demanded free copies of these statutes. DOC Policy 1.3.E.1 requires all inmates to pay fifteen cents per copy for cases and statutes. Sisney had adequate funds in his inmate trust account to purchase copies of the statutory version of RLUIPA, if he so desired. Even if Sisney did not have adequate funds to purchase copies of the statute, he had copies of RLUIPA and, thus, cannot show any actual injury for Loen's refusal to provide free copies to him. Loen is entitled to summary judgment on this claim.

## J.    Retaliation

"Conduct that retaliates against the exercise of a constitutionally protected right is actionable, even if the conduct would have been proper if motivated by a different reason." *Cody v. Weber*, 256 F.3d 764, 771 (8th Cir. 2001). Moreover, "the retaliatory conduct does not itself need to be a constitutional violation in order to be actionable. 'The violation lies in the *intent* to impede access to the courts.'" *Id.* (quoting *Madewell v. Roberts*, 909 F.2d 1203, 1207 (8th Cir. 1990) (emphasis in original)). Filing inmate lawsuits and prison grievances are protected First Amendment activities. *See Lewis,* 486 F.3d at 1028.

Sisney claims Slykhuis retaliated against him for filing this lawsuit by not allowing Sisney to receive and possess The Jailhouse Lawyer's Handbook. On October 29, 2004, Sisney was notified by the SDSP mail room that a booklet from the Center for Constitutional Rights was rejected. After sending a kite to the mailroom he was advised the booklet was The Jailhouse Lawyer's Handbook. Sisney proceeded through the grievance process and he was informed that Slykhuis rejected this publication. Slykhuis contends the publication was rejected based upon prison rules rather than

based upon an intent to retaliate against Sisney. Sisney, however, contends his receipt of this publication was not in violation of any prison rule and that several other inmates have received and continue to possess this publication. This contention is supported by Sisney's later receipt of this publication. Slykhuis states he was not "aware of the *details* of the claims involved in this lawsuit." (Slykhuis Affidavit, Doc. 221 at ¶ 10 (emphasis added).) Sisney contends Slykhuis had knowledge of the filing of this lawsuit and although Slykhuis states he wasn't aware of the *details* of the lawsuit, he does not dispute that he knew this lawsuit had been filed by Sisney. The Court finds there is a genuine issue of material fact regarding whether Slykhuis' rejection of this publication was done with the intent to impede Sisney's access to the courts and, therefore, summary judgment will be denied on the retaliation claim against Slykhuis.

Sisney was allowed to add a retaliation claim against Wagner. (*See* Doc. 57 and 81.) This retaliation claim is alleged in paragraphs 110 and 131 in Sisney's Amended Complaint, Doc. 60. Defendants refer in general to retaliation claims against all Defendants in the discussion in their brief regarding the retaliation claim against Slykhuis and make a general argument in a footnote that all retaliation claims, including the claim against Wagner, fail on the merits because all Defendants are entitled to summary judgment on all of Sisney's claims. (Doc. 216 at p. 46, 49 & n. 15.) Wagner acknowledged Sisney's retaliation claim in her Affidavit, Doc. 219, at ¶¶ 8 and 9, and denied that she retaliated against him for filing this lawsuit. At least one paragraph in Sisney's Affidavit supports his claims of retaliation: "Wagner has engaged in a pattern of discrimination, derogatory treatment, and harassment from her first day as Cultural Activities Coordinator towards the Jewish Group and me. After initiating this litigation, treatment toward me has progressively gotten worse." (Sisney Affidavit, Doc. 247, at ¶ 46.) Sisney also alleged that Wagner interfered with his relationship with The Aleph Institute, which was providing information and materials to Sisney and other SDSP inmates practicing Judaism. The Aleph Institute was helping Sisney in his practice of Judaism until Wagner inquired why the Aleph Institute was assisting him when he was not born of a Jewish mother, had not gone through a proper conversion and did not study under a local Rabbi. (Wagner Affidavit, Ex. K.) Although neither Wagner nor Sisney focused on this claim, the Court finds there is evidence in the record to support Sisney's retaliation claim and the Court finds there

50